2010 WY 162
**Richard Allen TUCKER, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. S–10–0006.

Supreme Court of Wyoming.

Dec. 10, 2010.

Representing Appellant: Diane E. Courselle, Director, UW Defender Aid Program; Kevin Ward, Student Intern. Argument by Mr. Ward.

Representing Appellee: Bruce A. Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Appellant, Richard Allen Tucker, challenges his convictions on two counts of aggravated vehicular homicide, in violation of Wyo. Stat. Ann. § 6–2–106(b)(i) (LexisNexis 2007). Appellant contends the district court erred when it allowed the investigating officer's testimony to be admitted as the opinion of a lay witness, and that there was insufficient evidence at trial to support the elements of aggravated vehicular homicide. He also asserts that the district court's imposition of consecutive sentences violated his Fifth Amendment right to be free from double jeopardy and his Eighth Amendment right against cruel and unusual punishment. We find no prejudicial error and affirm the convictions.

## ISSUES

[¶ 2]  Mr. Tucker presents the following issues:

1. Whether the district court improperly admitted lay testimony by a law enforcement officer which was in fact expert testimony?

2. Whether the evidence at trial was insufficient to prove the elements of aggravated vehicular homicide?

3. Whether the sentence imposed is in violation of the law and the United States Constitution and the Constitution of the State of Wyoming?

The State frames the issues as follows:

1. Did the district court abuse its discretion when it admitted the portion of Trooper Badura's testimony challenged in the motion for new trial?

2. Was there sufficient evidence of Appellant's guilt?

3. Were Appellant's consecutive sentences illegal?

## FACTS

[¶ 3]  On December 20, 2008, at approximately 6:00 p.m., Appellant, his girlfriend, K.P., and her son, Z.P., arrived at the Lucky Five Bar in Shoshoni, Wyoming.  At around 8:15 p.m., the bartender stopped serving Appellant alcohol due to his level of intoxication. The bartender offered to find someone to drive Appellant home but Appellant refused. At approximately 9:15 p.m., Appellant asked the bartender for help starting his truck, an extended-cab Dodge Dakota, because he believed that the battery was dead.  The bartender then asked another patron, a mechanic who had just arrived at the bar, to help Appellant with his vehicle.

[¶ 4]  The mechanic, Appellant, a nearby female patron, and K.P. then went outside to attempt to start Appellant's truck.  At this point, Z.P. was asleep in the backseat of the truck.  The mechanic pulled his vehicle nose-to-nose with Appellant's truck but, upon further inspection, determined that the truck

would not start because the clutch had not been pressed.  During this time, Appellant was in the driver's seat attempting to start the truck, K.P. was in the passenger seat with her head against the passenger door, and Z.P. was asleep in the backseat.  After it was determined that the truck did not need a jump, Appellant got out of the truck momentarily while the female patron got into the driver's seat, pushed in the clutch, and started the truck.  Appellant got back into the driver's seat and the female patron saw Appellant drive away.

[¶ 5]  Approximately seven miles from Shoshoni, the truck left the road, flipped over, and crashed into a tree.  K.P. and Z.P. were ejected from the vehicle and were found dead at the scene of the accident.  Appellant, however, exited the vehicle of his own accord and was treated at Riverton Memorial Hospital for a concussion and for abrasions[1] on various areas of his body.  Appellant's blood-alcohol content measured .26% approximately one and a half hours after the crash.  A subsequent toxicology analysis revealed that approximately three hours after the crash, K.P.'s blood-alcohol content was .28% and Z.P.'s blood-alcohol content was .27%.

[¶ 6]  Although most of the windows in the truck were destroyed, the driver's side of the vehicle had relatively little damage and the driver's side window and extended-cab window remained intact.  Blood samples were collected from the passenger's side dashboard, door-frame, and extended-cab window, and from the front and rear windshields. The blood samples collected from the passenger's side extended-cab window and the passenger's side door frame were consistent with the DNA profile of Z.P.

[¶ 7]  Evidence produced at trial indicated that the amount of time that elapsed from Appellant's departure from the Lucky Five Bar and the accident was less than ten minutes.  The time frame was established by the fact that, just a few blocks from the bar, the truck was recorded as it passed a gas station surveillance camera at 9:45 p.m. and the fact that the passerby who discovered the acci-

---

1. The attending physician testified that an abrasion is an "indication of damage to the skin tissue, ... it's not a laceration that requires surgery, that's just a bruise, basically, with damage to the skin."

dent called the police at 9:54 p.m. The officer who responded to the call testified that it would take approximately six minutes, if driving the speed limit, to travel from the Lucky Five Bar to the scene of the accident.

[¶ 8] Prior to trial, the district court issued a case management order instructing the parties to designate "[a]ll witnesses, including expert witnesses," and to provide a summary of their testimony. In response, the State filed a witness list designating the investigating officer as a witness, and provided the following description of the officer's proposed testimony:

> Trooper Badura will testify concerning all aspects of his investigation of the events and circumstances relevant to this case including his observations of the victims and defendant, interviews conducted with the defendant and witnesses, observations he made at the scene, and observations he made of defendant's vehicle, including the collection of potential evidence on or within defendant's vehicle by the Wyoming State Crime Lab. (See reports)

The State also provided a copy of the officer's traffic investigation report to defense counsel. In that report, the officer stated that "[e]vidence leads this investigator to believe Richard Tucker was driving at the time of the crash...." The State did not designate the officer as an expert witness.

[¶ 9] Shortly before trial, Appellant filed a "Motion to Exclude State's 'Expert,'" which sought to prevent the investigating officer from testifying as an expert. The court granted the motion "in part" but also indicated that the officer could testify "in accordance with his designation."

[¶ 10] During trial, and prior to the officer's testimony, Appellant again brought the matter to the attention of the court in an attempt to limit opinion testimony from the officer. Counsel for the State advised the court: "Judge, the trooper is not testifying as an expert and I don't know how many times or different ways I can say it." The court, after reviewing the State's witness designation, commented: "I don't read [the designation] to indicate that the trooper is offering any sort of an expert opinion about anything, I don't believe that the trooper

would be qualified under this designation to offer expert opinion...." Before the hearing concluded, defense counsel attempted to clarify:

[DEFENSE COUNSEL]: Your Honor, just so it's absolutely clear, so Mr.—I'm sorry, Trooper Badura will not be stating that Mr. Tucker was driving the vehicle as his narration in the report says, before the State does that they need to notify the Court.

[PROSECUTION]: Judge, that's an ultimate question and I'm not going to ask him that.

COURT: That would be in the area of an expert opinion, an expert is qualified to offer opinions about the ultimate issues, I don't think Trooper Badura's designation qualifies him as being able to offer that kind of opinion whether he possesses the qualifications or not.

[¶ 11] Before the officer took the stand, another hearing was held concerning the anticipated testimony. Counsel for the State indicated that the officer would provide lay opinion testimony pursuant to W.R.E. 701 regarding the positions of the occupants of the vehicle at the time of the crash. It was the officer's opinion that Appellant was driving. Defense counsel objected, contending that the opinion testimony was not lay opinion testimony and was not admissible under W.R.E. 701. The court stated that it would limit the officer's testimony to the matters described in the witness designation and that it would give a curative instruction to the jury in the event that the officer's testimony crossed into the realm of expert opinion.

[¶ 12] During the State's examination of the officer, the prosecution asked him to describe his training in accident investigations and his experience in investigations involving ejections. The officer stated that he had taken two accident investigation courses and had investigated roughly 50 accidents involving ejections. The State also asked the officer to give his opinion as to where the victims were seated prior to being ejected from the vehicle. The officer testified that "[b]ased on the factors of the statements I have taken, the victims at the scene, their

injuries, the blood splatters, the blood coming from the back and the side, the evidence taken for DNA, my opinion is that [Z.P.] was in the back seat, his head went through the passenger side." The officer further testified that "[b]ased on my opinion, I believe that [Z.P.] was in the back passenger side and that [K.P.] was in the passenger's side, the front passenger's side seat." Finally, when asked whether he thought the accident was influenced by alcohol impairment, the officer testified that "[m]y opinion based on the scene is that whoever was driving, out of the three occupants of the vehicle, they were all intoxicated, alcohol involvement [sic] impairment was a factor in the crash."

[¶ 13] Defense counsel repeatedly objected to the State's questions regarding the officer's training and experience, and to the officer's testimony regarding the position of the occupants of the vehicle, on the grounds that he was stating opinions that only an expert witness could provide. In response, the court instructed the jury several times that the investigating officer could not provide expert opinions and as to how much weight, if any, should be given to opinion testimony from a witness who is not an expert witness.

[¶ 14] Ultimately, the jury found Appellant guilty on both counts of aggravated vehicular homicide. Appellant was subsequently sentenced to 12 to 20 years for each conviction, with the sentences to be served consecutively.

## DISCUSSION

### 1. Lay Opinion Testimony

[¶ 15] Appellant contends that the officer's opinion as to the respective positions of the occupants of the vehicle before the crash was not properly admitted as lay opinion testimony. He argues that the testimony should have been excluded because it was not based solely on the officer's own perceptions and because the testimony required the officer to draw on his specialized training.

[¶ 16] We review evidentiary rulings for an abuse of discretion.

A trial court's decision on the admissibility of evidence is entitled to considerable def-

erence, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion. As long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.

*Phillip v. State,* 2010 WY 14, ¶ 10, 225 P.3d 504, 509 (Wyo.2010).

[¶ 17] Wyoming Rule of Evidence 701 governs the admission of opinion testimony by a lay witness:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

[¶ 18] In defining the proper scope of lay opinion testimony, this Court stated in *Schmunk v. State* that W.R.E. 701 incorporates the personal knowledge requirement of W.R.E. 602, which provides, in part, that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." 714 P.2d 724, 734 (Wyo.1986). In *Schmunk,* we held that a son's testimony that he suspected his father of killing his mother was inadmissible because it was not based on personal knowledge or perception. *Id.* at 735. We explained that "[u]nder Rule 701, the witness must have perceived firsthand the pertinent events or matters, and his inferences or opinion must be rationally based on his perception; his testimony must be rejected if his firsthand observation was inadequate to support an opinion." *Id.* (quoting 3 Louisell and Mueller, Federal Evidence § 376 at 618–619); *see also United States v. Peoples,* 250 F.3d 630, 640–41 (8th Cir.2001) (error to admit an investigator's opinion testimony under F.R.E. 701 where the investigator "lacked first-hand knowledge of the matters about which she testified" and based her opinions on "her investigation after the fact, not on her perception of the facts").

[¶ 19] Applying the rule articulated in *Schmunk* to this case, we find that the officer's testimony exceeded the scope of per-

missible lay opinion testimony because the officer relied on matters that were outside his personal knowledge and that were obtained through his investigation after the fact. It is undisputed that the officer's opinion was not based solely on his personal perceptions. He testified that his opinion as to the positioning of the occupants of the vehicle was based on "the factors of the statements I have taken, the victims at the scene, their injuries, the blood splatters, the blood coming from the back and side, [and] the evidence taken for DNA [testing]...." The secondhand accounts from the witnesses at the bar and the DNA evidence obtained after it was sent to a crime lab for testing contained evidence that was beyond the personal knowledge and perception of the officer.

■ [¶ 20] The officer's opinion testimony was also not based on matters within the realm of common experience. Lay opinion testimony is intended "only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *Peoples*, 250 F.3d at 641 (citing *United States v. Cortez*, 935 F.2d 135, 139–40 (8th Cir.1991); *United States v. Figueroa–Lopez*, 125 F.3d 1241, 1244–45 (9th Cir.1997)). In accordance with this principle, we have held that "W.R.E. 701 cannot be read to allow a witness who fails to qualify as an expert to offer opinion testimony 'where the subject in question lies outside the realm of common experience and requires special skill or knowledge.' " *Carroll v. Bergen*, 2002 WY 166, ¶ 21, 57 P.3d 1209, 1217 (Wyo.2002) (citing *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Engineers, Inc.*, 843 P.2d 1178, 1190 (Wyo.1992) (quoting 3 David W. Louisell & Christopher B. Mueller, Federal Evidence § 376 at 419 (Supp.1992))).

[¶ 21] Confining lay opinion to the realm of common experience, in turn, is consistent with the distinction between lay and expert testimony that is made by W.R.E. 701 and W.R.E. 702. Wyoming Rule of Evidence 702 indicates that opinion testimony based on specialized knowledge is the province of an expert witness:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

If a witness's testimony draws on experience beyond the ken of the average person, that witness must meet the qualification requirements of Rule 702. Offering lay opinion testimony that is based on specialized knowledge ignores the distinction made by W.R.E. 701 and W.R.E. 702, and further, subverts the disclosure and qualification requirements for expert witnesses. *See Peoples*, 250 F.3d at 641; *Figueroa–Lopez*, 125 F.3d at 1246. Indeed, for these reasons, it is often stated that expert testimony may not be admitted under the guise of lay opinions. *See, e.g., Peoples*, 250 F.3d at 641.

[¶ 22] In *People v. Stewart*, the Supreme Court of Colorado addressed the issue of whether an officer's reconstruction of an accident was within the proper bounds of lay opinion testimony under provisions of the Colorado Rules of Evidence that are identical to the Wyoming Rules of Evidence. 55 P.3d 107 (Colo.2002). In that case, although the prosecution did not seek to qualify the officer as an expert, "the officer attested that he had received 240 hours of instruction in investigating traffic accidents, including eighty hours of 'intense technique in accident investigation' and eighty hours in accident reconstruction," before offering an opinion as to how the incident at issue occurred. *Id.* at 122. The court applied the reasoning of *Peoples* and *Figueroa–Lopez* and concluded that "where, as here, an officer's testimony is based not only on [his] perceptions and observations of the crime scene, but also on [his] specialized training or education, [he] must be properly qualified as an expert before offering testimony that amounts to expert testimony." *Id.* at 124. The court further stated:

> While [the officer's] testimony about his observations of the crime scene and his investigation of the incident were proper, it

was inappropriate for the court to permit him to testify as a lay person about his reconstruction of the crime scene and his deductions about such matters as the vehicle's direction, position, and speed. *Id.* The court found that the trial court abused its discretion in admitting the officer's testimony without requiring that he be qualified as an expert. *Id.* However, the court ultimately held that the error was harmless because the officer's conclusions about the speed and angle of the vehicle were substantiated by the testimony of other witnesses. *Id.*

[¶ 23] We find the reasoning of *Stewart* particularly persuasive in light of the factual similarity to the case at hand. In this case, the investigating officer's opinion as to the respective positions of the occupants of the truck prior to the accident was based on his training and experience in accident investigations. This is apparent from the officer's statements that he had taken and passed a 40–hour course in basic accident investigations and an 80–hour course in advanced traffic accident investigations, and that he had investigated roughly 50 traffic accidents involving ejections. The officer described his training in detail:

> Your advanced investigation courses will ... go through your basic diagramming again and your measurements. You're going to learn depth measurements using formulas, trip formulas, speed formulas, impact formulas[;] you've got other formulas to do with fall and rise and you will take into consideration elevation, slopes, the speed of the vehicle.

Moreover, the officer also created a diagram of the accident based on his measurements at the scene and explained the diagram as it was projected to the jury:

> [T]his is the point where [the truck] goes off the road right here for about 274 feet and these are markings that I observed in the road. And it comes back onto the asphalt in the lane of travel, overcorrects, comes back this way, and right here we'll have striation marks, the tire track, it's kind of the skid marks through here and then it goes into a broadway—a broadside skid on the last part of the pavement, into

the dirt down to here and this is about the area where the vehicle, like I said, it trips or the center of gravity is now outside of the wheels of the tire base, the wheelbase, and it flips. What happens is it will land about here, the first impact you can observe that I saw there and you can see it, and when it trips what it did is—looking at the vehicle, there's no impact on the right side so it actually flew in the air and it did a roll and it landed on the passenger side.

Appellant did not object to any aspect of the officer's "accident reconstruction." He did not object to the officer's personal observations at the scene, to the testimony concerning the measurements that were taken, or to the officer's conclusions as to the path of the vehicle as it left the road and then crashed into a tree. The objections to the officer's opinion testimony were limited to the locations of the occupants of the vehicle. Nevertheless, the officer's training and expertise provided the background for that opinion testimony. The State, however, never claimed that the officer was an expert and qualified to give that opinion.

[¶ 24] The officer's testimony was not proper lay opinion testimony. The testimony was based on matters beyond the officer's personal knowledge or perception, and was based in large measure on the officer's training and experience, which were beyond the ken of the average person. It was error to admit the evidence as lay opinion testimony under W.R.E. 701.

[¶ 25] Having determined that error occurred, we must now consider whether that error was harmless.

The harmless error standard is set out in W.R.A.P. 9.04: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court." *See also* W.R.Cr.P. 52(a). An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant had the error never occurred. To demonstrate harmful error, the defendant must show prejudice under "circumstances which manifest inherent unfairness and injustice, or conduct which offends the

public sense of fair play." *Johnson v. State*, 790 P.2d 231, 232 (Wyo.1990). Under our harmless error analysis, we must judge whether the jury's verdict might have been different but for the witnesses' testimony.

*Wilks v. State*, 2002 WY 100, ¶ 21, 49 P.3d 975, 985 (Wyo.2002).

[¶ 26] Appellant contends that the testimony, particularly because it came from a law enforcement officer, was prejudicial and that, without this testimony, the resulting verdict would have been more favorable. We disagree. The overwhelming weight of the remaining evidence establishes that Appellant was the driver of the vehicle. This evidence includes (1) the testimony from two eyewitnesses who placed Appellant in the driver's seat of the truck just before leaving the Lucky Five Bar, and who saw Z.P. asleep in the backseat and K.P. resting in the passenger seat; (2) the testimony from one of those witnesses who saw Appellant drive the truck away from the bar; (3) the short amount of time that elapsed from when Appellant left the bar to when the accident occurred; (4) the location of the blood collected from the truck; (5) the lack of damage to the driver's side of the truck; (6) the relatively minor injuries suffered by Appellant; and (7) the fact that Appellant owned the truck. Furthermore, the district court instructed the jury several times as to the fact that the officer was not an expert and as to the weight, if any, to be accorded to opinion testimony from a witness who is not an expert.

[¶ 27] In light of the overall weight of the evidence and the curative instructions to the jury, we cannot conclude that there is a reasonable probability that, had the error not occurred, the verdict would have been more favorable to Appellant. The error was harmless.

■ [¶ 28] Finally, although he did not object at trial, Appellant contends on appeal that the officer's opinion that alcohol impairment was a factor in the crash was also impermissible expert testimony. Because Appellant did not object to this testimony, we apply the plain error standard of review.

*See, e.g., Luftig v. State*, 2010 WY 43, ¶ 11, 228 P.3d 857, 860 (Wyo.2010).

[¶ 29] Appellant argues that the officer was not relying on his personal knowledge of the facts in stating his opinion that alcohol impairment was a factor in the crash, and that the testimony is therefore inadmissible as lay opinion testimony. We agree that the officer could not have known that the victims were intoxicated based on his personal observations because the officer did not know that the victims were intoxicated until he received the coroner's blood toxicity analysis. The officer, through personal observation of Appellant at the scene of the accident, could have deduced that Appellant was intoxicated. However, his opinion that Appellant was driving the vehicle was based upon factors beyond personal observation. It was error to admit this testimony.

■ [¶ 30] We conclude, however, that this error was harmless. The evidence introduced by the State established that all occupants of the vehicle had blood-alcohol concentrations that were over three times the legal limit. Further, the evidence established that the occupants of the truck had been drinking at the Lucky Five Bar for several hours and that the bartender stopped serving Appellant alcohol due to his level of intoxication. The eyewitness testimony from the patrons at the bar also indicated that Appellant was so intoxicated that he needed assistance to start his truck despite the fact that it was in working order. In light of the remaining evidence establishing that alcohol impairment was a factor in the crash, there is no reasonable possibility that the verdict might have been more favorable to Appellant had the error not occurred.

## 2. Sufficiency of the Evidence

[¶ 31] Appellant next contends that there was insufficient evidence to establish his guilt. The elements of aggravated vehicular homicide are identified in Wyo. Stat. Ann. § 6–2–106(b)(i), which reads, in part, as follows:

(b) A person is guilty of aggravated homicide by vehicle and shall be punished by imprisonment in the penitentiary for not more than twenty (20) years, if:

(i) While operating or driving a vehicle in violation of W.S. 10–6–103, 31–5–233 or 41–13–206, he causes the death of another person and the violation is the proximate cause of the death.

[¶ 32] The vehicular homicide charge in this case was based on a violation of Wyo. Stat. Ann. § 31–5–233(b) (LexisNexis 2007), which provides:

(b) No person shall drive or have actual physical control of any vehicle within this state if the person:

(i) Has an alcohol concentration of eight one-hundredths of one percent (0.08%) or more; or

(ii) To a degree which renders him incapable of safely driving:

(A) Is under the influence of alcohol.

Pursuant to these statutes, the State was required to prove that Appellant was intoxicated, that he was driving the vehicle, and that his intoxication was the proximate cause of the victims' deaths. Appellant does not dispute that there was sufficient evidence to establish that he was intoxicated at the time of the crash. Rather, he argues that the evidence was insufficient to establish that he was driving the truck when it crashed or to establish that his intoxication was the proximate cause of the crash and resulting deaths.

[¶ 33] The standard of review for determining whether evidence is sufficient to support a conviction is well-established:

In reviewing the sufficiency of the evidence . . ., we examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. This standard applies whether the supporting evidence is direct or circumstantial. *Martin v. State*, 2007 WY 2, ¶ 32, 149 P.3d 707, 715 (Wyo.2007), citing *Butcher v. State*, 2005 WY 146, ¶ 16, 123 P.3d 543, 549 (Wyo.2005). *See also, Garay v. State*, 2007 WY 130, ¶ 2, 165 P.3d 99, 100 (Wyo.2007).

*Anderson v. State*, 2009 WY 119, ¶ 6, 216 P.3d 1143, 1145 (Wyo.2009).

[¶ 34] Because there were no witnesses to the crash, the jury was required to rely on circumstantial evidence to conclude that Appellant was driving. Circumstantial evidence is "proof of facts or circumstances from which the existence or non-existence of other facts may reasonably be inferred." *John Q. Hammons, Inc. v. Poletis*, 954 P.2d 1353, 1356 (Wyo.1998). "Circumstantial evidence is not evidence of a lower order; the law makes no distinction between the weight to be given to either direct or circumstantial evidence." *Id.* at 1357–58.

[¶ 35] In reviewing the sufficiency of the evidence we do not distinguish between direct and circumstantial evidence. *Smith v. State*, 2009 WY 2, ¶ 15, 199 P.3d 1052, 1057 (Wyo.2009). A jury is entitled to draw reasonable inferences from the evidence in reaching a conclusion. We have given the following description of a permissible inference: "An inference is a process of reasoning by which a fact or proposition is deduced fairly and logically from other facts proven or admitted. An inference is truly evidence. The weight to which it is entitled depends upon the facts and circumstances of each case. . . ." *Id.* (citing *Seeley v. State*, 959 P.2d 170, 176 (Wyo.1998)).

[¶ 36] Accepting all reasonable inferences from the State's evidence, we find that the jury could have reasonably concluded that Appellant was driving at the time of the crash. Excluding the investigating officer's opinion as to the positions of the occupants of the vehicle, there was ample evidence to support the conclusion that Appellant was driving. Witnesses placed the victims in the passenger and back seats of the vehicle and saw Appellant drive away from the bar. The accident occurred precisely within the time frame established by the State, which allowed little or no time for the occupants to adjust their positions. In addition, the fact that there was very little damage to the driver's side of the vehicle, whereas the rest of the truck was destroyed, matches the relatively minor physical harm that Appellant experienced as

compared to the victims. We find that there was sufficient evidence for the jury to make the reasonable inference that Appellant was driving the vehicle at the time of the accident.

[¶ 37] We also find that there was sufficient evidence to establish that Appellant's conduct was the proximate cause of the victims' deaths. In order to establish proximate cause, there must be sufficient evidence that the crash and resulting deaths were the natural and probable consequence of Appellant's wrongful act of driving under the influence to a degree which rendered him incapable of safely operating a vehicle. *See Edwards v. State*, 2007 WY 146, ¶ 10, 167 P.3d 636, 639 (Wyo.2007); *Glazier v. State*, 843 P.2d 1200, 1204 (Wyo.1992); *Hodgins v. State*, 706 P.2d 655, 657 (Wyo.1985).

[¶ 38] Appellant argues that the State did not establish proximate cause because it failed to show what caused the truck to leave the road. Appellant suggests many possible events that could have caused the accident, such as an attempt to avoid wildlife in the road, an attempt to avoid an oncoming car, or a vehicle malfunction. However, there was no evidence that any of these events occurred. On the other hand, there was overwhelming evidence that Appellant was driving while intoxicated.

[¶ 39] We have previously addressed proximate cause in this context. For example, in *Glazier*, the appellant and his girlfriend were riding on the appellant's motorcycle while the appellant was intoxicated. The motorcycle skidded as it went around a turn and the crash resulted in the death of the appellant's girlfriend. We found the evidence sufficient to establish proximate cause and explained:

> In this case, the motorcycle left the highway in broad daylight at a high rate of speed. Appellant was under the influence of alcohol and drugs. This accident resulted. This evidence was sufficient to support the trial court's finding that appellant was incapable of safely driving and that this was the proximate cause of the accident. A reasonable person would foresee that driving a motorcycle while under the influence of impairing substances to such a

degree that they are unable to drive safely might cause severe injury or death to themselves or another person.

*Glazier*, 843 P.2d at 1204; *see also Allen v. State*, 2002 WY 48, ¶ 43, 43 P.3d 551, 566 (Wyo.2002) ("One who drinks and drives should reasonably foresee that some among the potential victims of drunken driving will not wear seat belts and that such victims, among others, might be seriously injured in an alcohol-induced collision."); *Bloomquist v. State*, 914 P.2d 812, 819 (Wyo.1996) ("The jury could have reasonably concluded that Appellant was intoxicated, that he drove his vehicle in a reckless manner, and that either or both circumstances were the proximate cause of the victim's death.").

[¶ 40] In this case, the prosecution introduced evidence that showed Appellant had a blood-alcohol content of .26% after the crash. The State proved that Appellant was driving the truck when it went off the road and crashed into a tree, and further, that the roads were dry that night and that weather conditions were good. The evidence was sufficient for the jury to conclude that Appellant's driving under the influence was the proximate cause of the victims' deaths.

### 3. Fifth Amendment—Double Jeopardy

[¶ 41] Appellant next argues that imposing multiple sentences for the same act violates his right to be free from double jeopardy under both the United States and Wyoming Constitutions. The Fifth Amendment to the United States Constitution and Article 1, Section 11 of the Wyoming Constitution guarantee that a person will not be placed twice in jeopardy for the same criminal offense. Although the language of the respective double jeopardy provisions is dissimilar, "they have the same meaning and are co-extensive in application." *Vigil v. State*, 563 P.2d 1344, 1350 (Wyo. 1977). We have followed the federal courts' interpretation of the United States Constitution in stating that "the double jeopardy provisions of both Constitutions provide an accused three protections: 1) protection against a second prosecution for the same offense following an acquittal; 2) protection

against a second prosecution for the same offense after a conviction; and 3) protection against multiple punishments for the same offense." *Meyers v. State*, 2005 WY 163, ¶ 9, 124 P.3d 710, 714 (Wyo.2005) (citing *Pope v. State*, 2002 WY 9, ¶ 14, 38 P.3d 1069, 1072 (Wyo.2002)). In this case, Appellant argues that his sentence falls within the third category, the protection against multiple punishments.

[¶ 42] In instances where the protection against multiple punishments is implicated and multiple convictions are based on violations of *different* statutes, a double jeopardy claim is analyzed under the "same elements" test described in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which Wyoming adopted in *State v. Keffer*, 860 P.2d 1118, 1131 (Wyo. 1993). That test asks "whether each provision requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182. However, in cases that involve two violations of the *same* statute, the "same elements" test does not apply. Instead, when two violations arise from the same statute, we look directly to the intent of the legislature to determine the appropriate "unit of prosecution." *See Amrein v. State*, 836 P.2d 862, 865 (Wyo.1992). In these situations, we have held that "statutory construction and legislative intent will control the determination whether, when there are multiple victims from a single act or course of conduct, there is only one crime or as many crimes as there are victims." *Id.* at 864; *Tuggle v. State*, 733 P.2d 610, 612 (Wyo.1987); *Vigil*, 563 P.2d at 1352–53; *see also United States v. Ansaldi*, 372 F.3d 118, 125 n. 3 (2d Cir.2004) ("Ordinarily, courts apply the so-called 'Blockburger test' to determine whether or not two charged offenses constitute different crimes. That analysis is inappropriate in this case, because there is only one statute at issue, and so, nothing to compare. Rather than determining whether one act falls within two distinct statutes, as in *Blockburger*, we are asking whether two acts constitute one statutory offense.") (citation omitted), *cert. denied*, 543 U.S. 949, 125 S.Ct. 364, 160 L.Ed.2d 266, *and cert. denied*, 543 U.S. 960, 125 S.Ct. 430, 160 L.Ed.2d 324 (2004); *United States v. Weathers*, 186 F.3d 948, 952 (D.C.Cir.1999) ("Where two violations of the same statute rather than two violations of different statutes are charged, courts determine whether a single offense is involved not by applying the *Blockburger* test, but rather by asking what act the legislature intended as the 'unit of prosecution' under the statute."), *cert. denied*, 529 U.S. 1005, 120 S.Ct. 1272, 146 L.Ed.2d 221 (2000).

[¶ 43] This Court has never specifically decided whether a violation of Wyoming's aggravated vehicular homicide statute includes as many separate offenses as there are victims when multiple deaths result from a single automobile accident. However, we find guidance in two Wyoming cases that have addressed the issue in the context of other crimes. In the first case, *Vigil*, the appellant shot a gun at an automobile carrying five occupants and the jury returned guilty verdicts on all five charges of assault with a deadly weapon. 563 P.2d at 1346. The appellant challenged the judgment on double jeopardy grounds, despite the fact that he received only one sentence. In holding that a separate crime was committed with respect to each victim, we reasoned that because the statute at issue referred to an assault or battery upon "any human being," using the singular form of the noun, the statute was intended to protect individual persons. *See id.* at 1351–52. We noted that although the offenses arose from the same event, "each involves a separate victim and courts are protective of the individual citizen subjected to the criminal conduct of another." *Id.* at 1351. We also noted that many cases from other jurisdictions hold that "killing by culpable negligence several human beings in one automobile accident constitutes as many separate offenses as there are victims and consecutive sentences are proper." *Id.* at 1352 (citing cases that stand for the proposition that, under a vehicular homicide statute, the killing of a human being is the "gravamen of the offense" as opposed to the act of unlawfully operating a vehicle).

[¶ 44] In the second case, *Amrein*, the appellant was convicted on eight counts of cruelty to animals for failing to provide livestock with proper food, and was given eight consecutive sentences. 836 P.2d at 863. The

appellant argued that his right against double jeopardy was violated because his sentences resulted from a single continuous criminal act. *Id.* We ultimately found that the statute was ambiguous and invoked the rule of lenity in holding that it was error for the appellant to have been sentenced on more than one conviction. *Id.* at 865. We found the statute ambiguous because, although it referred several times to the singular noun and pronoun (as in "any animal," "it," and "the animal"), the statute also used the plural "animals" in the opening clause and the modifier "any" when referring to "animal." *Id.* Adding further support for the decision, we noted that "[a]s a general proposition, with few exceptions, in crimes against the person, when contrasted with crimes against property, there are as many offenses as individuals affected." *Id.* at 864 (quoting *Vigil,* 563 P.2d at 1352).

[¶ 45] In the present case, we find that the aggravated vehicular homicide statute includes as many separate offenses as there are individuals affected by the defendant's conduct. The focus of the statute, as in other homicide crimes, is on the resulting death of the victim, which indicates that the legislature intended to protect each individual citizen from harm. We agree with the courts that have addressed this issue and determined that the resulting death of the victim is the gravamen of the offense, as opposed to the act of unlawfully driving an automobile. *See, e.g., Bautista v. State,* 863 So.2d 1180, 1186 (Fla.2003) ("[T]he gravamen of the offense of DUI manslaughter is not a traffic violation, but the killing of a human being."); *Commonwealth v. Meehan,* 14 Mass.App.Ct. 1028, 1029, 442 N.E.2d 43 (Mass.App.Ct.1982) ("[T]he gravamen of the offense is the killing of a human being as distinguished from unlawful operation of a motor vehicle."); *Murray v. United States,* 358 A.2d 314, 321 (D.C.1976) ("The gravamen of the crime [of negligent homicide] is not the act of operating a motor vehicle negligently; rather, it is the killing of a human being."); *State v. Whitley,* 382 S.W.2d 665, 667 (Mo. 1964) ("The gravamen of the offense [of manslaughter] is the killing of a human being, and the statute by its terms contemplates that there shall be as many offenses as there are human beings killed, whether by one or several acts.").

[¶ 46] An examination of the language of the vehicular homicide statute also leads us to the conclusion that the legislature intended to protect the lives of each individual. The statute states that a person is guilty if he causes "the death of another person." Wyo. Stat. Ann. § 6–2–106(b)(i). Comparing this language to the statutes at issue in *Vigil* and *Amrein,* we find that the legislature's use of "another person" in the singular form of the noun evidences an intent that each death caused under the statute constitutes a separate unit of prosecution. Indeed, this is also consistent with our finding in *Tuggle* that the word "another," when used in an aggravated assault and battery statute, "is a singular term and thus means each time 'another' is affected by said crime, it is a separate offense. The obvious intent of the legislature was to protect each individual." 733 P.2d at 612. Accordingly, we hold that each death that results from a violation of the vehicular homicide statute constitutes a separate unit of prosecution and that separate convictions and sentences for each death resulting from a single accident do not violate Appellant's right against double jeopardy.

### 4. Eighth Amendment—Cruel and Unusual Punishment

[¶ 47] Appellant next contends that imposing consecutive sentences of 12 to 20 years for two counts of aggravated vehicular homicide is cruel and unusual punishment. He argues that this sentence is disproportionate to the offense, yet he acknowledges that the same sentence was given for the same offense in *Allen,* 43 P.3d 551. The maximum penalty for each conviction under the vehicular homicide statute is 20 years. Wyo. Stat. Ann. § 6–2–106(b).

[¶ 48] This Court has rejected the common-law view that a sentence is not subject to appellate review if it is within the minimum and maximum limits set by statute. *Sampsell v. State,* 2001 WY 12, ¶ 6, 17 P.3d 724, 726 (Wyo.2001). Instead, when the imposition of a criminal sentence is within the

limits set by the legislature, we review the sentencing decision for an abuse of discretion. *Id.* In the context of sentencing decisions, this standard of review has been described as follows: "A sentence will not be disturbed because of sentencing procedures unless the defendant can show an abuse of discretion, procedural conduct prejudicial to him, and circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Smith v. State,* 922 P.2d 846, 848 (Wyo.1996) (quoting *Wright v. State,* 670 P.2d 1090, 1092 (Wyo.1983)).

[¶ 49] The United States Supreme Court recently revisited its Eighth Amendment jurisprudence in *Graham v. Florida,* —— U.S. ——, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825, 835 (2010):

> The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, [290,] 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, [598,] 2 L.Ed.2d 630 (1958) (plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy v. Louisiana,* 554 U.S. 407, 419, 128 S.Ct. 2641, 2649, 171 L.Ed.2d 525, 538 (2008) (quoting *Furman v. Georgia,* 408 U.S. 238, 382, 92 S.Ct. 2726, [2800,] 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)).
>
> The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances. *See, e.g., Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "[P]unishments of torture," for example, "are forbidden." *Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345 (1879). These cases underscore the essential principle that, under the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes.
>
> For the most part, however, the Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime. The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, [549,] 54 L.Ed. 793 (1910).

In *Solem v. Helm,* the U.S. Supreme Court adopted the following proportionality analysis, which the Wyoming Supreme Court has followed since *Oakley v. State,* 715 P.2d 1374, 1376–77 (Wyo.1986):

> In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Solem,* 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983). In *Oakley,* we stated that a proportionality analysis under *Solem* is only necessary where the sentence is grossly disproportionate to the crime.

> We will not engage in a lengthy analysis under all three of the *Solem* criteria, including a consideration of the sentences imposed on similarly situated defendants in this and other jurisdictions, except in cases where the mode of punishment is unusual or where the relative length of sentence to imprisonment is extreme when compared to the gravity of the offense (the first of the *Solem* criteria). Oakley's sentence does not merit that kind of in-depth *Solem* analysis, and the *Solem* opinion does not require that kind of analysis in a case such as this.

*Oakley,* 715 P.2d at 1379. In subsequent cases, we reiterated this principle, stating:

Our rule is in accord with the approach taken by the United States Supreme Court in *Harmelin v. Michigan*, where the court concluded that the *Solem* proportionality analysis is appropriate only "in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." [*Harmelin*], 501 U.S. 957, 1005, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring).

> *Dodge v. State*, 951 P.2d 383, 385 (Wyo. 1997). This application of *Oakley* is still followed by this Court. *Suval v. State*, 6 P.3d 1272, 1274 (Wyo.2000).

*Sampsell*, ¶ 10, 17 P.3d at 728. *See also Graham*, 130 S.Ct. at 2021 (the Eighth Amendment proportionality principle "forbids only extreme sentences that are 'grossly disproportionate' to the crime").

[¶ 50] In this case, we do not need to engage in a proportionality analysis because the length of Appellant's sentence is not extreme or unusual when compared to the gravity of the offense. Instead, we will use our standard rubric for assessing the reasonableness of the sentence, which gives consideration to the crime, its circumstances, and the character of the defendant. *Frederick v. State*, 2007 WY 27, ¶ 32, 151 P.3d 1136, 1146 (Wyo.2007). In its sentencing decision, the district court noted that Appellant had a blood-alcohol content that was over three times the legal limit at the time of the accident. The court noted that Appellant had a chronic history of alcohol and substance abuse that went untreated for decades, as well as a history of convictions for drunk-driving related offenses without any apparent attempt on his part to correct this behavior. Finally, the court considered the fact that Appellant's conduct resulted in the deaths of two people. The district court did not abuse its discretion in the sentencing decision in light of its careful consideration of the circumstances surrounding the crime and the character of Appellant.

**5. Sentencing Factors**

[¶ 51] Appellant's final argument focuses on the district court's recitation of aggrava-

ting factors as a basis for imposing consecutive sentences. Appellant argues that it was improper for the district court to consider aggravating factors when the legislature has not specified any aggravating factors for this particular offense. Appellant claims that our decision in *Jones v. State*, 2003 WY 154, 79 P.3d 1021 (Wyo.2003) suggests that consecutive sentences can only be imposed upon some finding of aggravated circumstances that have been identified by the legislature. We disagree. In *Jones*, we were unable to determine whether the district court had abused its discretion in imposing consecutive sentences because the court failed to provide an explanation for its sentencing decision:

> Given these circumstances, we are unable to effectively perform a meaningful review of the provision that the sentences be consecutive to the previous sentence. We are compelled to remand for another hearing at which the district court should enumerate the sources of its information, receive all information that may guide its decision, and make findings as appropriate. While such detailed findings are always beneficial to the review process, they are not always mandated. However, here, we remain as uncertain as to the foundation for imposition of consecutive sentences as we were prior to the remand. We conclude that a remand for further development of the record and the rendition of detailed findings is necessary under the unique circumstances of this case.

*Id.*, ¶ 14, 79 P.3d at 1026–27. In contrast to *Jones*, the district court in this case clearly described the factors that were considered in the sentencing decision. The court considered each of the objectives of criminal punishment, including deterrence, incapacitation, retribution, and rehabilitation, and described on the record how Appellant's character and personal history related to each of these objectives. Accordingly, we find no merit in Appellant's argument that the district court improperly considered aggravating factors in deciding to impose consecutive sentences.

**CONCLUSION**

[¶ 52] In sum, we hold that the district court erred in admitting the investigating

officer's opinion as to the location of the occupants of the vehicle at the time of the crash and as to whether alcohol impairment was a factor in the crash. However, in light of the remaining evidence produced by the State, these errors were harmless. The evidence was sufficient to establish that Appellant was driving the vehicle and that his intoxication was the proximate cause of the crash and the resulting deaths of the victims. Finally, we hold that Appellant's constitutional rights against double jeopardy and against cruel and unusual punishment were not violated by the imposition of consecutive sentences of 12 to 20 years. For these reasons, the decision of the district court is affirmed.

VOIGT, Justice, specially concurring.

[¶ 53] I concur in the result in this well-reasoned majority opinion, and I agree with nearly all of its analysis. I write separately only to address a particular point. Plainly stated, it is beyond me why the State did not offer Trooper Badura as an expert witness under W.R.E. 702 and offer some form of Wyoming Criminal Pattern Jury Instruction No. 6.08A (2004), which instruction tells the jury how to consider the opinion of an expert witness. The record clearly reflects that Trooper Badura is an expert in the field of accident investigation, and all of his opinions about the accident, including the position of the occupants within the vehicle, would have been admissible had he testified as an expert. It is true that opinion testimony as to the *guilt* of a defendant is inadmissible, whether from a lay witness or an expert witness. *Bennett v. State,* 794 P.2d 879, 881 (Wyo. 1990). That prohibition is not based upon the fact that "guilt" is the ultimate issue, but upon the fact that the determination of guilt is a mixed question of law and fact that is the jury's province. *Stephens v. State,* 774 P.2d 60, 66–67 (Wyo.1989), *overruled in part on other grounds by Large v. State,* 2008 WY 22, ¶ 30, 177 P.3d 807, 816 (Wyo.2008). The law in Wyoming is as follows:

The selection of the particular testimony to which Saldana now objects suggests he would have us extend the holding in *Stephens* to reach, and exclude, all opinion testimony, expert or not, on any issue that could go to proving an element of the crime charged. Saldana's view is that any analysis offered by a witness on the evidence presented at trial is equivalent to a direct, and thus impermissible, comment on the defendant's guilt. We are not inclined to accept this premise, especially in light of the provisions of Wyo.R.Evid. 702 that permit opinion evidence even on an ultimate issue. *Stephens; McCabe v. R.A. Manning Constr. Co.,* 674 P.2d 699 (Wyo. 1983). An interpretation of the evidence by a witness, even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt, is not in the same category as an actual conclusional statement on the guilt or innocence of the accused party. We are particularly firm in this determination if the record demonstrates the proffered opinion was helpful to the jury in determining the facts of the case and was elicited for that reason. Wyo.R.Evid. 702.

*Saldana v. State,* 846 P.2d 604, 616–17 (Wyo. 1993).

[¶ 54] An expert in the field of accident investigation or reconstruction, particularly one who investigated the scene immediately after the accident and who interviewed the pre-accident witnesses, may opine as to the position of the occupants in the vehicle, assuming that he or she is able to testify as to a sufficient basis for that opinion. That is what should have happened here.